## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| NATALIE NICHOLE MOODY and SHERENIA MOODY, individually and as next-of-kin to the Deceased, EUGENE MOODY, | ) ) ) ) | |
| | ) | |
|    Plaintiffs, | ) | **Case No. 3:20-cv-01086** |
| | ) | **Judge Aleta A. Trauger** |
| v. | ) | |
| | ) | |
| CLARENCE EARL FOSTER III, M.D., | ) | |
| | ) | |
|    Defendant. | ) | |

### <u>MEMORANDUM</u>

Before the court is defendant Clarence Foster, M.D.'s Motion for Summary Judgment (Doc. No. 54) on the plaintiffs' healthcare liability and wrongful death claims. The basis for the motion is that the lawsuit is barred by the applicable statute of limitations. Because it is clear from the undisputed facts that the original state court Complaint raising these claims was filed after the statute of limitations expired, the Complaint initiating this federal lawsuit is not saved by Tennessee's so-called "savings statute," Tenn. Code Ann. § 28-1-105(a), and the claims are time-barred. The defendant's Motion for Summary Judgment will, therefore, be granted, and all other pending motions will be denied as moot.

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In other words, the material on which a party relies in support of a summary judgment motion does not need to be in a form admissible in evidence; rather, once an objection is "properly made" under Rule 56(c)(2), "the proponent must 'show that the material is admissible as presented or . . . explain the admissible form that is anticipated.'" *Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A);

*see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II.     FACTS[1] AND PROCEDURAL HISTORY

Plaintiffs Natalie Nichole Moody and Sherenia Moody are the adult daughters of decedent Eugene Moody. (Doc. No. 1 ¶ 1.) On December 24, 2017, Mr. Moody underwent a kidney transplant performed by the defendant, Dr. Clarence Foster, at Centennial Medical Center ("Centennial"). Mr. Moody died eight days later, on January 1, 2018, after bleeding internally. Natalie Moody discovered no later than sometime in January 2018 that Dr. Foster was the surgeon who performed the surgery, and Sherenia Moody learned within "a month or two" after Mr. Moody's funeral in early January 2018 that Dr. Foster had performed the surgery. (Doc. No. 50, S. Moody Dep. 14–15.[2])

Mr. Moody's long-time domestic partner, Malinda Prince, testified that, when Mr. Moody's daughters came to Nashville for the funeral in January 2018, Natalie Moody "kept" saying she wanted to see the autopsy, because she was "under the impression" that Mr. Moody should not have been approved to undergo surgery. (*Id.* at 77.) Sherenia Moody likewise was upset

---

[1] The facts for which no citations are provided are drawn from the plaintiff's Response to the defendant's Statement of Undisputed Material Facts (Doc. No. 62) or the defendant's Reply to the plaintiff's Statement of Additional Undisputed Material Facts (Doc. No. 63) and are undisputed for purposes of the Motion for Summary Judgment. All statements of fact recited herein are either undisputed or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

[2] The original transcript pagination deviates from the page numbers assigned by the court's electronic filing system for several of the deposition transcripts filed by the parties. For all of the transcripts cited herein, the court will employ the original transcript pagination.

and questioned whether something had "gone wrong," in response to which Prince told her, "They don't want us to see the autopsy so I'm pretty sure something took place." (*Id.* at 79.)

Natalie Moody testified that Prince told her that, the day her father died, "he was in the bathroom and . . . he was calling for help. And . . . once they got the bathroom door open, he was sitting down on the toilet in the bathroom and that he was bleeding out. There was blood everywhere." (Doc. No. 49, N. Moody Dep. 33.) Natalie Moody had discussions with Prince and her sister about wanting to obtain the autopsy report to find out what happened, because it did not make sense to her that "he went from getting a new organ to now we're burying him." (*Id.* at 37.) Sometime between January and April 2018, Natalie Moody told Prince that she intended to find out what had happened to her father. (*Id.* at 52.) Sherenia Moody likewise testified that they wanted the autopsy report because they were "trying to find out what was wrong, what happened. I mean, people don't just die. There's a reason for it." (doc. No. 50, S. Moody Dep. 15.) Prince's granddaughter, Ursula Wills, also had discussions with Natalie and Sherenia about Mr. Moody's death during this timeframe. Wills confirmed: "We all discussed what could possibly have went wrong, what would cause him to bleed, because most arrows were pointing to him bleeding internally." (Doc. No. 51, Wills Dep. 51.) She stated that they naturally all believed that something had gone wrong during the surgery: "So again, process of elimination, it all pointed back to surgery. So we wanted the autopsy to see if it would tell us exactly what part of the surgery went wrong." (*Id.* at 52.) She denied that they were "digging for anything." (*Id.*) Rather, they just wanted to know what happened. (*Id.*)

On April 11, 2018, Prince and Wills, accompanied by attorney Brian Manookian,[3] attended

---

[3] Manookian's law license is currently temporarily suspended. (Doc. No. 58-1, Manookian Decl. ¶ 2.)

a meeting with Dr. Foster and two Centennial representatives. (April 11, 2018 Email from B. Manookian, Doc. No. 55-1.) The plaintiffs produced Brian Manookian's April 11, 2018 email to Dr. Foster and various Centennial personnel, summarizing that meeting, with their Rule 26 initial disclosures in this case. Malinda Prince testified that the email contains an accurate summary of the April 11, 2018 meeting. (Doc. No. 52, Prince Dep. 10.)[4]

Manookian's email begins by stating that he represents the estate of Eugene Moody and directing the recipients to "have no further contact with his relatives." (Doc. No. 55-1, at 1.) It is undisputed that Mr. Moody's family hired Manookian and his law firm at or around the time of the meeting.

The email then describes the meeting as follows:

> The meeting began with [the Centennial representative] Laura Baker asking the family, "What do you want to know?" I responded that we sought an explanation for the fatal outcome, culminating in Mr. Moody experienced a massive, unexplained bleed post-operatively that appeared to be a result of intra-operative error.

> Dr. Foster first attempted to blame the outcome on a heart attack. He made this statement repeatedly. I responded by pointing out that Mr. Moody died following a massive bleed-out that could not be explained by a cardiac event, When I pressed him on that fact, Dr. Foster quickly admitted that his explanation was not true. . . .

---

[4] The plaintiffs object to the defendant's reliance on Manookian's email on the basis that Prince did not receive the email and it is not otherwise "authenticated or admissible." (Doc. No. 62 Resp. ¶ 8.) This is not a proper objection under Rule 56(c)(2), as the plaintiffs have made no effort to show that the email "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). More to the point, the plaintiffs admit that *they* produced the email with their Rule 26 disclosures (Doc. No. 62 Resp. ¶ 7), so they can hardly dispute its authenticity. In addition, Dr. Foster, as a recipient of the email, would be capable of authenticating it. The plaintiffs' objection is even more baffling, given that they do not contend that the email inaccurately summarizes the contents of the meeting or that Prince is incapable of confirming whether the email accurately summarizes the contents of the meeting that she attended, and the plaintiffs have submitted a Declaration from Brian Manookian in which he effectively reiterates the contents of his April 11, 2018 email. (Doc. No. 58-1 ¶¶ 7–13.) Finally, it is clear that the email does not qualify as hearsay, as it is not offered "in evidence to prove the truth of the matter asserted in the [email]," Fed. R. Evid. 801, but, rather, to show that certain matters were discussed during the meeting.

> Dr. Foster again admitted that Mr. Moody did not die as a result of a heart issue, but would not say more. . . . While [the "Transplant Advocate"] was out of the room [calling Risk Management], Dr. Foster stated that the autopsy showed that the sutures for the transplant were intact. He stated that he was very relieved to find this out as he was previously very worried that he had made an intra-operative mistake. Notably, he did not disclose whether Mr. Moody's bleed-out occurred as a result of Dr. Foster closing an area he should not have.
>
> Dr. Foster and Laura Baker then made a number of additional admissions relative to Dr. Foster and TriStar Centennial's Transplant Center's liability in this matter.

(*Id.* at 1–2.) At the same time, according to Manookian, Dr. Foster "was adamant that he had done nothing wrong to injure or cause Mr. Moody's death." (Doc. No. 58-1, Manookian Decl. ¶ 12.)

According to Prince, the purpose of the meeting was to discuss Mr. Moody's death as a result of the kidney transplant performed by Dr. Moody; by that point, they "just wanted to see the autopsy," because they already suspected, as Manookian's email stated, that "an intra-operative error had occurred." (Doc. No. 52, Prince Dep. 11.) Prince agreed that Dr. Foster kept "trying to say at first" that Mr. Moody's death was related to a heart issue but ultimately "acknowledged that Mr. Moody did not die as a result of a heart issue." (*Id.* at 12.) She also stated that, "once he bled like when we found him, we knew it was something different." (*Id.*)

On April 12, 2018, Dr. Foster and Centennial retained counsel to represent them during the pre-suit stage of proceedings in connection with the death of Mr. Moody. On May 10, 2018, counsel for Dr. Foster made available to Manookian's law firm, as plaintiffs' counsel, the Centennial records for Moody that Foster's attorneys had received from Centennial's healthcare information management company, Ciox Health. (Doc. No. 55-3, Carter Decl. ¶ 4.) In response, also on May 10, 2018, the defendant's attorney received an email from plaintiffs' attorney, Brian Manookian, stating: "Call me regarding Moody. I've reviewed the autopsy report and a good deal of the records. I would like to propose something." (Doc. No. 55-3, at 4; *see also* Carter Decl. ¶ 6.) The defendant does not contend that the medical records delivered on May 10, 2018 constituted

the entirety of Mr. Moody's medical record maintained by Centennial, but the set produced on that day obviously included, at a minimum, the autopsy report for Mr. Moody, among other records relating to the kidney transplant.

> The "Summary of Case" in the autopsy report reads, in part:
>
> The transplanted kidney is identified, along with clotted and liquid blood adjacent to the kidney and in the abdominal cavity, presumably due to recent surgical implantation of the kidney. *The intima of the iliac artery is lacerated*, but the sutures in the vasculature are intact.
>
> The bandage over the incision is saturated with blood at the time of autopsy with bloody fluid in the drain, and medical records reveal that a large amount of blood was on the floor when he was found lethargic at home. His laboratory values on admission reflect significant blood loss . . . .

(Doc. No. 55-4, at 5 (emphasis added).)

Manookian, as counsel for the plaintiffs, made repeated requests for a "compete copy of Mr. Moody's medical records" from counsel for Dr. Foster and Centennial, on May 3, 7, 8, and 10. (Doc. No. 58-1, Manookian Decl. ¶ 23.) Counsel for Dr. Foster produced a "complete copy of Mr. Moody's medical records" from Centennial—over 7,400 pages in length—"via encrypted CDs on June 21, 2018." (*Id.* ¶¶ 24–25.)

On December 21, 2018, within one year after Mr. Moody's death, plaintiffs, through their attorneys, mailed a pre-suit notice letter to Dr. Foster in compliance with the Tennessee Healthcare Liability Act, Tenn. Code Ann. § 29-26-121(a)(1). (Doc. No. 55-5.) On October 7, 2019, the plaintiffs, through Manookian and current counsel, filed their first Complaint in Davidson County Circuit Court, alleging that Dr. Foster "negligently lacerated the intima of Moody's renal artery," negligently failed to recognize either during or after the operation that he had lacerated the intima of the renal artery, and, as a result, discharged him home, "where he bled internally and undetected for days, leading to his gruesome death on January 1, 2018." (Doc. No. 55-6, State Court Compl. ¶¶ 14–15.) The plaintiffs nonsuited the state court case on February 21, 2020 and subsequently

filed their second Complaint in this court within one year of that date, on December 18, 2020, asserting the same medical negligence claim against Dr. Foster, based on the same factual allegations as set forth in the first Complaint.

The defendant seeks dismissal of the Complaint on the basis that it is barred by the statute of limitations.

## III.     ANALYSIS

### A.     The Applicable Statute of Limitations

The Tennessee Healthcare Liability Act ("THLA") incorporates a one-year statute of limitations. Tenn. Code Ann. § 29-26-116(a)(1) (incorporating Tenn. Code Ann. § 28-3-104). The limitations period is deemed to run from the date of discovery of the alleged injury. *Id.* § 29-26-116(a)(2). In the event of fraudulent concealment by the defendant, the limitations period still runs from one year after "discovery that the cause of action exists." *Id.* § 29-26-116(a)(3). The one year limitations period is extended by 120 days if the plaintiff complies with the THLA's requirement of mailing pre-suit notice of "the potential claim to each health care provider that will be a named defendant at least sixty (60) days before the filing of a complaint based upon health care liability." *Id.* § 29-26-121(a)(1), (c).

As explained in this court's prior opinion denying Dr. Foster's Motion to Dismiss (Doc. No. 17), if the original state court Complaint was timely, then the lawsuit in this court, having been filed less than one year after the voluntary nonsuit of the state case, is timely under Tennessee's saving statute, which states:

> If [an] action is commenced within the time limited by a rule or statute of limitation, but the judgment or decree is rendered against the plaintiff upon any ground not concluding the plaintiff's right of action . . . , the plaintiff . . . may . . . commence a new action within one (1) year after the reversal or arrest.

Tenn. Code Ann. § 28-1-105(a). However, if the original state court complaint was *not* timely, then the saving statute does not "save" the case filed in this court, which will, as a result, be barred by the application of the statute of limitations.

"Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run." *Jodway v. Orlans, PC*, 759 F. App'x 374, 379 (6th Cir. 2018) (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)).

## B.     The Discovery Rule

Under Tennessee law, "a medical malpractice cause of action accrues when one discovers, or in the exercise of reasonable diligence should have discovered, both (1) that he or she has been injured by wrongful or tortious conduct and (2) the identity of the person or persons whose wrongful conduct caused the injury." *Sherrill v. Souder*, 325 S.W.3d 584, 595 (Tenn. 2010). In a wrongful death medical malpractice suit, the question is "whether the plaintiff bringing the suit, rather than the [d]ecedent, had notice of an actionable wrong." *Young ex rel. Young v. Kennedy*, 429 S.W.3d 536, 559 (Tenn. Ct. App. 2013) (quoting *Holliman v. McGrew*, 343 S.W.3d 68, 75 (Tenn. Ct. App. 2009)).

The law is clear, however, that the plaintiff "need not actually know of the commission of a wrongful action in order for the limitations period to begin, but need only be aware of facts sufficient to place a reasonable person on notice that the injury was the result of the wrongful conduct of another." *Sherrill*, 325 S.W.3d at 595. In other words,

> [i]f enough information exists for discovery of the wrongful act through reasonable care and diligence, then the cause of action accrues and the tolling of the limitations period ceases. Neither actual knowledge of a breach of the relevant legal standard nor diagnosis of the injury by another medical professional is a prerequisite to the accrual of a medical malpractice cause of action.

*Id.* The cause of action accrues, not upon actual notice, but "on inquiry notice of a wrongful act." *Id.*

In *Sherrill*, the Tennessee Supreme Court noted that the question of whether a plaintiff "exercised reasonable care and diligence in discovering the injury or wrong is usually a question

of fact." *Id.* at 596 (quoting *Shadrick v. Coker*, 963 S.W.2d 726, 737 (Tenn. 1998)). It nonetheless affirmed summary judgment for the defendant, finding that "the facts in the record and all reasonable inferences demonstrate[d]" that the plaintiff's cause of action was time-barred. *Id.* And in reaching that conclusion, the court expressly rejected the plaintiff's contention that the limitations period begins to run "only when the plaintiff learns that the injury is due to tortious or wrongful conduct." *Id.* at 596. Instead, the court held, while actual "knowledge of a wrongful act is *enough* to trigger the limitations period," it "is not *required* before a medical malpractice claim accrues." *Id.* (emphasis in original).

### C.    Application of the Discovery Rule

The defendant argues that the cause of action accrued in this case, at the very latest, on May 10, 2018, when the plaintiffs, through their attorney, received the autopsy report. The plaintiffs claim that the cause of action accrued, at the earliest, on June 21, 2018, when their attorney received Mr. Moody's entire 7,500-page medical record from Centennial.

The plaintiffs are clearly incorrect. The court finds it likely, in fact, that the plaintiffs were "aware of facts sufficient to place a reasonable person on notice that the injury was the result of the wrongful conduct of another," *Sherrill*, 325 S.W.3d at 595, as soon as they learned that their father died shortly after being found "bleeding out" in the bathroom just over a week after the transplant surgery. (*See* Doc. No. 49, N. Moody Dep. 33.) Both plaintiffs, as well as Ursula Wills and Malinda Prince, testified that, in light of how Mr. Moody died, they immediately suspected that something had "go[ne] wrong" with the surgery. (Doc. No. 52, Prince Dep. 79.) Prince told Sherenia Moody she was "pretty sure something took place," based on their difficulties in obtaining a copy of the autopsy report. (*Id.*) Natalie Moody had discussions with Prince and her sister about wanting to obtain the autopsy report to find out what happened, because it did not make sense to her that her father "went from getting a new organ to now we're burying him." ((Doc. No. 49, N. Moody Dep. at 37.) Sometime between January and April 2018, she told Prince

that she intended to find out what had happened. (*Id.* at 52.) Sherenia Moody likewise testified that they wanted the autopsy report because they were "trying to find out what was wrong, what happened. I mean, people don't just die. There's a reason for it." (Doc. No. 50, S. Moody Dep. 15.) Ursula Wills confirmed: "We all discussed what could possibly have went wrong, what would cause him to bleed, because most arrows were pointing to him bleeding internally." (Doc. No. 51, Wills Dep. 51.) She stated that they all believed that something had gone wrong during the surgery: "So again, process of elimination, it all pointed back to surgery. So we wanted the autopsy to see if it would tell us exactly what part of the surgery went wrong." (*Id.* at 52.) In other words, not only would a reasonable person have been placed on inquiry notice by the information in their possession of a possible surgical error, these plaintiffs and the decedent's other close family members were actually inquiring and suspicious that an error had occurred. The plaintiffs, Mr. Moody's daughters, also knew within a short period of time the identify of Dr. Foster as Mr. Moody's transplant surgeon.

The conclusion that the plaintiffs had knowledge of the identity of the potential tortfeasor and sufficient information to be on inquiry notice that a wrongful act had occurred shortly after their father's death is confirmed by what occurred during the April 11, 2018 meeting between Prince, Wills, and Manookian, as the attorney for Mr. Moody's estate, and Dr. Foster and two Centennial representatives. As set forth in Manookian's email summarizing that meeting, he and the plaintiffs already knew at that point that Mr. Moody had died of a "massive bleed post-operatively," and they suspected that this event was the "result of intra-operative error." (Doc. No. 55-1, at 1.) Although Dr. Foster allegedly attempted to blame the outcome on a heart attack initially, he also allegedly admitted that "his explanation was not true." (*Id.*) Manookian's email concluded by expressly stating that they believed Mr. Moody's death was the result of medical error: "We were kicked out of today's meeting . . . for the audacity of coming prepared and willing

to challenge the clearly false assertions of health care providers willing to lie to cover up a death."

(*Id.* at 2.) He also threatened litigation:

> No written demand for payment has yet been made on behalf of my clients. If this case were settled now, it would not trigger an NPDB Report for Dr. Foster . . . . It would likewise not trigger the inevitable media and licensing scrutiny of another catastrophe at the Transplant Center of HCA's flagship hospital.
>
> Let me know if you would like to discuss. Otherwise, *a written demand, pre-suit notice, and a very detailed lawsuit will follow*.

(*Id.* (emphasis added).) In other words, Manookian, as agent for the plaintiffs, apparently believed that he was in possession of sufficient information to file suit on behalf of the plaintiffs as of April 11, 2018.

In an attempt to avoid the conclusion that their cause of action accrued by that date, the plaintiffs emphasize that Dr. Foster repeatedly denied having committed any error that led to Mr. Moody's death. However, Manookian's email makes it clear that they did not believe him. More to the point, a healthcare practitioner's denial of liability would not negate the information in a claimant's possession giving rise to a plausible inference to the contrary. Dr. Foster, in fact, continues to deny liability. If such a denial were sufficient to override evidence to the contrary, a cause of action for medical malpractice might never accrue.

Further, even if the cause of action had not accrued by or before April 10, 2018, it clearly accrued no later than May 10, 2018, the day Manookian received the autopsy report from which the allegations of medical negligence set forth in the Complaint were derived. Specifically, the Complaint alleges that Dr. Foster "negligently lacerated the intima of Moody's renal artery," failed to recognize either during or after the surgery that he had done so, and discharged Mr. Moody home, where he continued to bleed internally for a week, which led to his "gruesome death on January 1, 2018." (Doc. No. 1 ¶¶ 14–15.) The autopsy report states, in relevant part, that the "*intima of the iliac artery is lacerated*," that "[t]he bandage over the incision is saturated with blood at the time of autopsy with bloody fluid in the drain," and that the decedent's "laboratory values on

admission reflect significant blood loss." (Doc. No. 55-4, at 5 (emphasis added).) In other words, receipt of the autopsy report, standing alone, clearly provided "enough information . . . for discovery of the wrongful act through reasonable care and diligence," thus triggering the accrual of the cause of action. *Sherrill*, 325 S.W.3d at 595.

The plaintiffs' insistence that the cause of action did not accrue until they received Mr. Moody's entire medical record from Centennial (covering a period of several years) is not explained, but they seem to be suggesting that they needed additional information in order to verify the identity of every individual who might have contributed to Mr. Moody's care in connection with the kidney transplant and to determine whether others, in addition to or instead of Dr. Foster, might be liable. The fallacy of this argument is demonstrated by the fact that the Complaint does not contain a single reference to any information derived from the medical record the plaintiffs received on June 21, 2018, aside from the information already included in the autopsy report. Even their Response to the Motion for Summary Judgment does not identify any information they did not already know, and could not have learned, before receiving the medical record and that they contend was necessary to put a reasonable person on notice of the existence of a cause of action. Regardless, it bears repeating that "[n]either actual knowledge of a breach of the relevant legal standard nor diagnosis of the injury by another medical professional is a prerequisite to the accrual of a medical malpractice cause of action." *Sherrill*, 325 S.W.3d at 595. The cause of action accrues, not upon actual notice, but "on inquiry notice of a wrongful act." *Id.*

Finally, the plaintiffs' fraudulent concealment argument, besides lacking any evidentiary support, is simply beside the point, because allegations of fraudulent concealment do not obviate the application of the discovery rule. *See Duncan v. Leeds*, 742 F.2d 989, 992 (6th Cir. 1984) (applying Tennessee law, holding that a plaintiff who seeks to toll the statute of limitations based on fraudulent concealment must show (1) "that the defendant took affirmative steps to conceal the cause of action"; and (2) "that the plaintiff *could not have discovered his cause of action despite*

*exercising reasonable diligence*" (citation omitted) (emphasis added)). In this case, fraudulent concealment or not, the plaintiffs were in actual possession of the autopsy report—and all of the information they needed to file suit—by May 10, 2018.

Giving the plaintiffs every possible benefit of the doubt, their healthcare liability cause of action accrued no later than May 10, 2018. The limitation period expired no later than one year plus 120 days later, on September 7, 2019. Because that day fell on a Saturday, the plaintiffs had until Monday, September 9, 2019 to file suit. The state court Complaint, filed on October 7, 2019, was filed outside the statute of limitations. As a result, the Tennessee saving statute does not apply to "save" this lawsuit, which is also time-barred.

## IV.    CONCLUSION

For the reasons set forth herein, the defendant is entitled to summary judgment on statute of limitations grounds. The pending summary judgment motion (Doc. No. 54) will be granted, and all other pending motions will be denied as moot.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge